IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
Civil Action No. 07-218

| | |
|---|---|
| **WILLIAM J. FISHER, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**LG PHILIPS LCD COMPANY LTD, LG PHILIPS LCD AMERICA, INC., LG ELECTRONICS INC., ROYAL PHILIPS ELECTRONICS NV, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC., AU OPTRONICS CORPORATION, AU OPTRONICS CORPORATION AMERICA, CHI MEI OPTOELECTRONICS, CHI MEI OPTOELECTRONICS USA, INC., SHARP CORPORATION, SHARP ELECTRONICS CORPORATION, TOSHIBA CORPORATION, MATSUSHITA DISPLAY TECHNOLOGY CO., LTD., HITACHI LTD., HITACHI DISPLAYS, LTD., HITACHI AMERICA LTD., HITACHI ELECTRONIC DEVICES (USA), INC., SANYO EPSON IMAGING DEVICES CORPORATION, NEC CORPORATION, NEC LCD TECHNOLOGIES, LTD., IDT INTERNATIONAL LTD., INTERNATIONAL DISPLAY TECHNOLOGY CO., LTD., INTERNATIONAL DISPLAY TECHNOLOGY USA INC., CHUNGHWA PICTURE TUBES LTD. and HANNSTAR DISPLAY CORPORATION,**<br><br>**Defendants.** | **CLASS ACTION COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

## INTRODUCTION

1.    Plaintiff brings this class action pursuant to Section 16 of the Clayton Act, 15

U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C.

§ 1, to recover damages under North Carolina state antitrust and common laws and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendants' violations of those laws.

2.      This case arises out of a long-running nationwide conspiracy beginning no later than January 1, 2002 ("Class Period"), among all Defendants and their co-conspirators with the purpose and effect of fixing prices, allocating market shares, eliminating and suppressing competition, constraining supply, limiting capacity, and committing other unlawful practices designed to inflate and stabilize the prices of Thin-Film Transistor Liquid Crystal Displays (TFT-LCDs or panels).

3.      As a direct and proximate result of this conspiracy, Plaintiff and all other similarly situated consumers paid artificially inflated prices for products utilizing TFT-LCD technology. Such products include, but are not limited to, flat panel televisions and computer monitors, laptop computers, mobile phones, and digital music players.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337. The Court has jurisdiction over the North Carolina state claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy. The Court also has jurisdiction over the North Carolina state claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

- 2 -

5.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

6.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States:

> a.     Defendants and their co-conspirators participated in a continuous and uninterrupted flow in interstate commerce to customers located in North Carolina;
>
> b.     Defendants and their co-conspirators sold and shipped substantial quantities of TFT-LCD to customers located in North Carolina;
>
> c.     Data, information, correspondence and financial material were exchanged between customers located in North Carolina and the Defendants and their co-conspirators; and/or
>
> d.     Money flowed between banks in North Carolina and the Defendants and their co-conspirators.

7.     The Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority, including each other as co-conspirators) have:

> a.     Transacted business in North Carolina;
>
> b.     Contracted to supply or obtain services or goods in North Carolina;

- 3 -

    c.      Intentionally availed themselves of the benefits of doing business in North Carolina;

    d.      Produced, promoted, sold, marketed or distributed their products or services in North Carolina and, thereby, profiting from their access to the markets in North Carolina;

    e.      Caused tortious damage by act or omission in North Carolina;

    f.      Caused tortious damage in North Carolina by acts or omissions committed outside such jurisdictions while (i) regularly doing or soliciting business in such jurisdictions, and/or (ii) engaging in other persistent courses of conduct within such jurisdictions and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdictions; and

    g.      Committed acts and omissions that Defendants knew or should have known would cause damage (and, in fact, did cause damage) in North Carolina to Plaintiff and members of the Class while (i) regularly doing or soliciting business in such jurisdictions, and/or (ii) engaging in other persistent courses of conduct within such jurisdictions and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdictions.

8.     The Defendants otherwise had the requisite minimum contacts with North Carolina, such that, under the circumstances, it is fair and reasonable to require the Defendants to come to this Court to defend this action.

- 4 -

## THE PARTIES

### Plaintiff

9.    Plaintiff William J. Fisher is a citizen and resident of Guilford County, North Carolina, and is neither an infant nor an incompetent.

10.    On or about February 3, 2007, Plaintiff purchased a flat panel television manufactured by Sony utilizing LCD-TFT technology from Sears in Greensboro, North Carolina.

### Defendants

11.    Defendant LG Philips LCD Company Ltd. is a Korean corporation with its executive offices at LG Twin Towers, 20 Yoido-dong, Youngdungpo-gu, Seoul, Korea. LG Philips LCD Company LTD. is a joint venture between LG Electronics Inc. and Royal Philips Electronics NV. During the time period covered in this Complaint, LG Philips LCD Company Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world.

12.    Defendant LG Philips LCD America, Inc. is a California corporation with its principal place of business located at 150 East Brokaw Road, San Jose, California. During the time period covered in this Complaint, LG Philips LCD America, Inc. manufactured, sold and distributed TFT-LCD throughout the United States and the world. LG Philips LCD Company Ltd and LG Philips LCD America, Inc. are collectively referred to herein as "LG.Philips."

13.    Defendant LG Electronics Inc. is a Korean corporation with its headquarters at LG Twin Towers 20, Yoido-dong, Youngdungpo-gu, Korea. During the time period covered in this Complaint, LG Electronics Inc. was a venturer in LG Philips LCD Company Ltd. and was an active participant in the conduct herein described.

USCA4 10

14.     Defendant Royal Philips Electronics NV is a Dutch corporation with its headquarters at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. During the time period covered in this Complaint, Royal Philips Electronics NV was a venturer in LG.Philips Co., Ltd. and was an active participant in the conduct herein described.

15.     Defendant Samsung Electronics Co., Ltd., is a Korean corporation with its executive offices at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Korea. During the time period covered in this Complaint, Samsung Electronics Co., Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world.

16.     Defendant Samsung Semiconductor, Inc. is a California corporation located at 3655 North First Street, San Jose, California. Samsung Semiconductor, Inc. is a wholly owned and controlled subsidiary of Defendant Samsung Electronics Co., Ltd. During the time period covered by this Complaint, Samsung Semiconductor, Inc. manufactured, sold and distributed TFT-LCD throughout the United States and the world. Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. are collectively referred to herein as "Samsung."

17.     Defendant AU Optronics Corporation is a Taiwanese corporation with its headquarters at No.1, Li-Hsin Road 2, Hsinschu Science Park, Hsinchu, Taiwan, R.O.C. During the time period covered by this Complaint, AU Optronics Corporation manufactured, sold and distributed TFT-LCD throughout the United States and the world.

18.     Defendant AU Optronics Corporation America is a wholly owned and controlled subsidiary of Defendant AU Optronics Corporation. AU Optronics Corporation America is headquartered at 9720 Cypresswood Drive, Suite 241, Houston, Texas. During the time period covered by this Complaint, AU Optronics Corporation America manufactured, sold and

- 6 -

distributed TFT-LCD throughout the United States and the world. AU Optronics Corporation and AU Optronics Corporation America are collectively referred to herein as "AU Optronics."

19.    Defendant Chi Mei Optoelectronics is a Taiwanese corporation with its headquarters at No.3, Sec.1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, Taiwan R.O.C. During the time period covered in this Complaint, Chi Mei Optoelectronics manufactured, sold and distributed TFT-LCD throughout the United States and the world.

20.    Defendant Chi Mei Optoelectronics USA, Inc. is a wholly-owned and controlled subsidiary of Chi Mei Optoelectronics. Chi Mei Optoelectronics USA, Inc. is headquartered at 101 Metro Drive, Suite 510, San Jose, California. During the time period covered by this Complaint, Chi Mei Optoelectronics USA, Inc manufactured, sold and distributed TFT-LCD throughout the United States and the world. Chi Mei Optoelectronics and Chi Mei Optoelectronics USA, Inc. are collectively referred to herein as "CMO."

21.    Defendant Sharp Corporation is a Japanese corporation with its headquarters at 22-22 Nagaike-cho, Abeno-ku, Osaka, 545-8522, Japan. During the time period covered by this Complaint, Sharp Corporation manufactured, sold and distributed TFT-LCD throughout the United States and the world.

22.    Defendant Sharp Electronics Corporation is a wholly owned and controlled subsidiary of Sharp Corporation. Sharp Electronics Corporation is headquartered at Sharp Plaza, Mahwah, New Jersey. During the time period covered by this Complaint, Sharp Electronics Corporation manufactured, sold and distributed TFT-LCD throughout the United States and the

- 7 -

world.  Sharp Corporation and Sharp Electronics Corporation are collectively referred to herein as "Sharp."

23.     Defendant Toshiba Corporation is a Japanese corporation with its headquarters at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the time period covered by this Complaint, Toshiba Corporation manufactured, sold and distributed TFT-LCD throughout the United States and the world.

24.     Defendant Toshiba Matsushita Display Technology Co., Ltd. is a Japanese corporation with its headquarters at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.  During the time period covered by this Complaint, Toshiba Matsushita Display Technology Co., Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world.  Toshiba Corporation and Toshiba Matsushita Display Technology Co., Ltd. are collectively referred to herein as "Toshiba."

25.     Defendant Hitachi Ltd. is a Japanese corporation with its headquarters at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo, 101-0022, Japan.  During the time period covered by this Complaint, Hitachi Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world.

26.     Defendant Hitachi Displays, Ltd. is a Japanese corporation with its headquarters at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo 101-0022, Japan.  During the time period covered by this Complaint, Hitachi Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world.

27.     Defendant Hitachi America Ltd. is a wholly owned and controlled subsidiary of Hitachi Ltd.  Hitachi America Ltd. is a New York corporation with its headquarters at 50

- 8 -

Prospect Avenue, Tarrytown, New York. During the time period covered by this Complaint,
Hitachi America Ltd. manufactured, sold and distributed TFT-LCD throughout the United States
and the world.

28.    Defendant Hitachi Electronic Devices (USA), Inc. is a wholly owned and
controlled subsidiary of Hitachi Ltd. Hitachi Electronic Devices (USA), Inc. with its
headquarters at 575 Mauldin Road, Greenville, South Carolina. During the time period covered
by this Complaint, Hitachi Electronic Devices (USA), Inc. manufactured, sold and distributed
TFT-LCD throughout the United States and the world. Hitachi Ltd., Hitachi Displays, Ltd.,
Hitachi America Ltd., and Hitachi Electronic Devices (USA), Inc. are collectively referred to
herein as "Hitachi."

29.    Defendant Sanyo Epson Imaging Devices Corporation is a joint venture of Sanyo
Electric Co., Ltd. and Seiko Epson Corporation. Sanyo Epson Imaging Devices Corporation is
headquartered at World Trade Building 15F, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo, Japan.
During the time period covered by this Complaint, Sanyo Epson Imaging Devices Corporation
manufactured, sold and distributed TFT-LCD throughout the United States and the world.

30.    Defendant NEC Corporation is a Japanese corporation with its headquarters at 7-
1, Shiba 5-chome, Minato-ku, Tokyo, Japan. During the time period covered by this Complaint,
NEC Corporation manufactured, sold and distributed TFT-LCD throughout the United States and
the world.

31.    Defendant NEC LCD Technologies, Ltd. is a wholly owned and controlled
subsidiary of NEC Corporation. NEC LCD Technologies, Ltd. is a Japanese corporation with its
headquarters at 1753 Shimonumabe, Nakahara-ku, Kawasaki, Kanagawa, Japan. During the

- 9 -

USCA4 14

time period covered by this Complaint, NEC LCD Technologies, Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world. NEC Corporation and NEC LCD Technologies, Ltd. are collectively referred to herein as "NEC."

32. Defendant IDT International Ltd. is an entity organized under the laws of Bermuda with its principal place of business located at Block C, 9th Floor, Kaiser Estate Phase 1, 41 Man Yue Street, Hunghom, Kowloon, Hong Kong. During the time period covered by this Complaint, IDT International Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world.

33. Defendant International Display Technology Co., Ltd. is a Japanese corporation with its headquarters at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan. Defendant International Display Technology Co., Ltd. is a subsidiary of Defendant Chi Mei Optoelectronics Corporation. During the time period covered by this Complaint, International Display Co., Ltd. manufactured, sold and distributed TFT-LCD to customers throughout the United States and the world.

34. Defendant International Display Technology USA Inc. is a corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose, California. International Display Technology USA Inc. is a subsidiary of Defendant Chi Mei Optoelectronics Corporation. During the time period covered by this Complaint, International Display Technology USA Inc. manufactured, sold and distributed TFT-LCD to customers throughout the United States and the world.

35. Defendant Chunghwa Picture Tubes Ltd. is a Taiwanese corporation with its headquarters at 1127 Hopin Road, Padeh City, Taoyuan, Taiwan, R.O.C. During the time period

- 10 -

covered by this Complaint, Chunghwa Picture Tubes Ltd. manufactured, sold and distributed TFT-LCD throughout the United States and the world.

36. Defendant HannStar Display Corporation is a Taiwanese corporation with its headquarters at No.480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan, R.O.C. During the time period covered by this Complaint, HannStar Display Corporation manufactured, sold and distributed TFT-LCD throughout the United States and the world.

### Co-conspirators

37. Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint (the "co-conspirators") have participated in the violations of the antitrust laws of North Carolina for which Plaintiffs seek relief, and have performed acts and made statements in furtherance of the conspiracy.

38. The acts charged in this Complaint have been done by Defendants or were ordered or done by Defendants' officers, agents, employees, or representatives, while actively engaged in the management of Defendants' affairs.

39. Each of the Defendants named herein acted as an agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole agent in the United States for TFT-LCD made by its parent company.

### CLASS ACTION ALLEGATIONS

40. Plaintiff brings this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Plaintiff Class ("the Class") composed of and defined as follows:

- 11 -

All persons and entities residing in North Carolina who, from January 1, 2002 to present, purchased TFT-LCD in the United States indirectly from the Defendants.

Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities.

41.     This action has been brought and may properly be maintained as a class action

pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

- a.     The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

- b.     Based upon the nature of the trade and commerce involved, together with the number of indirect purchasers of TFT-LCD, Plaintiff believes that the members of the Class are sufficiently numerous such that joinder of all Class members is not practicable;

- c.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff indirectly purchased TFT-LCD from one or more of the Defendants or their co-conspirators and, therefore, has claims that arise from the same course of conduct that gives rise to the claims of the members of the Class and seeks relief that is common to the Class;

- d.     The following questions of law or fact, while not exclusive, are common as to the members of the Class:

- 12 -

i.  Whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain or stabilize the prices of the market for TFT-LCD;

ii.  Whether Defendants formed and operated a combination or conspiracy in order to allocate the market for TFT-LCD;

iii.  The operative time period of the Defendants' combination or conspiracy;

iv.  Whether Defendants' conduct caused injury to the business or property of Plaintiff and the members of the Class;

v.  The appropriate measure of the amount of damages suffered by the Class;

vi.  Whether Defendants' conduct violates Section 1 of the Sherman Act;

vii.  Whether Defendants' conduct violates North Carolina Gen. Stat. §§ 75-1 *et seq.*;

viii.  The appropriate nature of class-wide equitable relief.

e.  These and other common questions of law or fact predominate over any questions affecting only individual members of the Class;

f.  After a determination is made as to the predominating issues indicated above, the Class can be divided into logical and manageable subclasses;

g.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has no interests antagonistic to the Class.

- 13 -

Plaintiff has suffered the same harm as the members of the Class and has, and will continue to, zealously pursue claims against Defendants. Plaintiff has retained counsel competent and experienced in the prosecution of complex class actions, and in particular, counsel has broad experience in complex antitrust litigation similar in size, scope, and complexity to the present case.

h.  A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Moreover, even if the Class members themselves could afford such individual litigation, the judicial system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the judicial system due to the complex legal and factual issues presented by this case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

- 14 -

i.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

j.    In the absence of a class action, Defendants would be unjustly enriched as they would be permitted to retain the benefits acquired by way of their wrongful and illegal conduct.

## NATURE OF TRADE AND COMMERCE

42.    Throughout the Class Period, Defendants and their co-conspirators engaged in the business of manufacturing, marketing, and selling TFT-LCD throughout the United States and the world. During each year of the Class Period, sales of TFT-LCD totaled in the billions of dollars. According to estimates, the global LCD market will reach $69 billion in 2006.

43.    The most common application of liquid crystal technology is in LCDs and the most common form of LCD is the TFT-LCD. TFT-LCD is an active matrix LCD that utilizes thin-film transistor technology to improve the quality of the projected image. As an active matrix, the image-forming pixels are individually controlled by the transistor. Functionally, the basic structure of a TFT-LCD panel includes two glass substrates that sandwich a layer of liquid crystal. The front glass substrate is fitted with a color filter. The back glass substrate has transistors fabricated on it. When voltage is applied to the transistor, the liquid crystal is bent, thus allowing light to pass through and form a pixel. The front glass substrate then gives each pixel its own color, the combined effect of which is the formation of an image.

44.    As used herein, the term TFT-LCD includes all types of TFT-LCDs sold during the Class period.

- 15 -

45.    The types of TFT-LCD manufactured by Defendants are utilized in a broad array
of consumer applications. Representative products utilizing this technology include flat panel
televisions and computer monitors, laptop computers, mobile phones, and digital music players.
As such, these items are purchased by consumers both as stand-alone products and as parts of
integrated products.

46.    The Defendants sell their products to numerous end-brand customers, including
the world's leading manufacturers of the aforementioned product types. Consumers, in turn,
purchase TFT-LCD containing goods from these end-brand customers.

47.    The market for the manufacture and sale of TFT-LCD is conducive to the type of
collusive activity herein alleged. The market is oligopolistic in nature, with three suppliers
controlling more than 60% of the market. According to the market research firm iSuppli, in
2005, the world's three largest LCD makers by shipments were LG.Philips (21.3%), Samsung
(20.8%) and AU Optronics (20.2%).

48.    This oligarchy of suppliers is even more pronounced within the specific
categories of LCD panels. For example, LG.Philips, Samsung and AU Optronics account for
more than 66% of the LCD TV panel market, which is the fastest growing sector within the LCD
industry. The inclusion of Chi Mei boosts the market share of the top four suppliers to nearly
82%. Moreover, 76.8% of the market for Notebook PC LCD panels is controlled by the same
three top suppliers. By including Chi Mei Optoelectronics in the analysis, the market share of
the top four suppliers surpasses 86%. With this type of market control, major producers are able
to extract unusually high gross margins, such as the 22.3% and 25.0% margins claimed by
LG.Philips for the years 2003 and 2004, respectively.

- 16 -

49.     Retention of this control is facilitated by significant barriers to entry into the LCD market. These barriers are both technological and financial. "Due to the capital intensive nature of the display industry and the high production volumes required to achieve economies of scale, the international market for display device is characterized by significant barriers to entry," states a 2005 filing by LG.Philips with the Securities and Exchange Commission. Samsung, for example, has invested $2.3 billion in the first phase of its new production line of LCD panels in Tangjung, South Korea. The company has indicated it will invest another $1.7 billion in the line's second production phase. Similarly, Sharp recently invested $1.35 billion to build a factory in Kameyama, Japan that will focus its capacity solely on the production of panels for LCD TVs that measure 40 inches or more. Once built, these production facilities are expensive to operate. In 2005, it was estimated that TFT-LCD producers spent more than $30 million per day on maintaining these plants and the equipment.

50.     The structure of the industry itself facilitates collusive conduct by way of numerous cross-licensing arrangements between supposed competitors. Samsung and Sharp entered into such an agreement in 2006. Sharp also has a cross-licensing agreement with AU Optronics. In 2002, six companies (Chi Mei, AU Optronics, Chung Hwa Picture Tubes Ltd., Toppoly Optoelectronics Corp., Quanta Display Inc. and HannStar Display Corp.) entered into a seven-year license agreement with the Industrial Technology Research Institute (ITRI), whereby the parties were permitted to jointly possess certain common TFT-LCD patents.

51.     The TFT-LCD display industry is replete with trade groups and member organizations to which all the major producers of TFT-LCD belong. Irrespective as to the stated mission of these groups and organizations, the practical effect of their existence is the creation of

- 17 -

opportunities for collusion among market participants. The Society of Information Display (SID), for example, touts on its website several benefits of membership, including "many opportunities for networking with your peers and with leaders in the field-in person and electronically." Moreover, groups like SID inject themselves into "all of the technical and business disciplines that relate to display research, design, manufacturing, applications, marketing and sales." As such, the information shared at these formal and informal gatherings necessarily impacts all levels of the manufacture, marketing, and sale of TFT-LCD.

52. Significant consolidation among industry leaders has also occurred during the period alleged in this Complaint. The acquisition by AU Optronics of Quanta Display is indicative of this fact (AU Optronics was itself a product of the merger between Acer Display and Unipac Optoelectronics). Sharp also acquired Fujitsu Limited's LCD business in 2005.

## DEFENDANTS' ILLEGAL CONDUCT

53. Beginning on or about January 1, 2002, Defendants and their co-conspirators entered into an agreement, contract, combination, trust and/or conspiracy, the effect of which was to artificially inflate the prices at which they sold TFT-LCD.

54. Defendants, through their officers, directors and employees, effectuated the aforesaid contract, combination, trust or conspiracy between themselves and their co-conspirators by, among other things:

> a. Participating in meetings and conversations, including through various trade associations and committees, to discuss the prices of TFT-LCD in the United States;

> b. Agreeing, during those meetings and conversations, to charge prices at

- 18 -

specified levels and otherwise to increase and maintain prices of TFT-
LCD sold in the United States by way of artificially constraining the
production of TFT-LCD;

c.    Issuing price announcements and quotations in accordance with the
agreements reached; and

d.    Selling TFT-LCD to various customers in the United States at non-
competitive prices.

55.    The display industry has been marked historically by volatile supply-demand
swings, what is termed in the industry as the "crystal cycle." The boom-and-bust cycle
historically seen in the LCD industry results from alternating periods of oversupply and shortage,
creating downward and upward pressure on panel prices. When prices are high, manufacturers
invest in more production facilities which results in overproduction. Prices drop, creating more
demand, which causes manufacturers to invest in even more production facilities to satisfy the
demand. Then the cycle repeats.

56.    Back in 1999, there was a significant excess demand for LCD panels. Notebook
computer makers were not able to fill orders because they could not get the displays to complete
them. As a result, panel manufacturers poured as much as $5 billion into the construction of new
factories--notably in Korea and Taiwan--which had analysts predicting an oversupply.

57.    In order to avoid the next downturn in the "crystal cycle," manufacturers began to
devise strategies to coordinate their efforts to avoid a competitive market.

58.    At least as far back as the first quarter of 2002, the existence of supply constraints
in the manufacture of TFT-LCD were noted by DisplaySearch, a leading industry group. The

- 19 -

supply constraints were linked to a 6% increase in LCD monitor prices during the quarter. DisplaySearch noted these price increases limited the ability of LCD monitor brands to offer discounts or rebates on the product. The widening price gap between TFT-LCDs and the traditional Cathode Ray Tube (CRT) display forced companies to bundle LCDs with other equipment so as to disguise the price being paid by the consumer for the LCD monitor. Moreover, these price increases continued throughout what is traditionally considered to be the slow summer buying season when demand is lowest.

59.     During the time period covered by this Complaint, DisplaySearch also noted a decrease in the utilization of the fabrication plants where TFT-LCD was manufactured. From the second to the third quarter of 2002, it was projected that the number of fabrication plants operating at 90% or more of their capacity would decrease from 30 to 14 while the actual number of fabrication facilities increased from 49 to 53. This type of decrease in operating capacity is consistent with the later public sentiments of a leading producer of LCD glass who stated at an industry convention in Taiwan that the industry should take a collective look at reducing capacity to 85% in order to avoid price reductions.

60.     As the conspiracy continued through 2003, the manufacturers of TFT-LCD were able to continue increasing prices while at the same time shipping record amounts of the product. This series of price increases was the result of strong demand growth and smaller than expected supply growth. Analysts have also referenced the parallel pricing that was offered by the manufacturers of TFT-LCD during this period.

61.     According to an article in the *Korea Herald*, citing "industry sources," both Samsung and LG.Philips announced price increases of 3 to 5 percent on their 15 inch and 17 inch

- 20 -

LCD screens in May 2003. The move was purportedly intended to provoke the Taiwanese manufacturers, which control the largest market share for smaller LCD panels, to raise their prices. In the second half of 2003, the average price of LCDs larger than 10-inches rose from $219 in the second quarter to $271 in the fourth quarter.

62. The profit margin for TFT-LCD panels continued to rise and/or stabilize over the Class Period, even though the industry reached maturation and a decrease in input costs.

63. In a May 2006, presentation in Taiwan, the executive vice president of AU Optronics noted that prices for panels were dropping as fast as the decrease in production costs. He urged his competitors to reduce their capacity utilization rate by 5 to 10 percent, in order to avoid further price erosion. The AU Optronics executive stressed that as long as makers lower their capacity utilization rate by 5 to 10 percent, a balanced supply-demand situation can be easily achieved and further price erosion avoided.

64. Samsung signaled is willingness to go along with a capacity reduction by stating at the same conference that "it was possible to secure a reasonable amount of profit while following the industry leaders."

65. According to reports of the conference, Eddie Chen, spokesman for defendant CMO, reiterated that reduction of capacity utilization might be initiated if demand for panels continued to be weak.

66. In June 2006, Quanta Display, Inc., (which was subsequently purchased by AU Optronics), publicly announced that it had agreed to cut back on panel production after discussing the situation with AU Optronics. In a Bloomberg article dated June 2, 2006, Tsai Chuan-chuan, a spokeswoman for Quanta Display, was quoted as stating the move was made

after discussions with AU Optronics for "inventory control" reasons. In the same article, Max Cheng, the chief financial officer of AU Optronics, noted that AU Optronics' capacity utilization was at 95 percent, and stated that "Our principle is not to have inventory. If we have more orders then we will have more loading." This confirmed publicly that AU Optronics had reduced its fab utilization as signaled in May 2006. Shortly thereafter, AU Optronics cut its capacity utilization to 90 percent.

67.    By August 2006, prices for LCD panels began to rise.

## INVESTIGATIONS RELATING TO DEFENDANTS' CONDUCT

68.    In December 2006, South Korean flat screen makers LG.Philips LCD Co. Ltd. and Samsung Electronics, the world's two leading liquid crystal display (LCD) makers, each confirmed they are being investigated by both the Korean Fair Trade Commission and the United States Department of Justice (DOJ) "as part of an investigation of possible anticompetitive conduct in the LCD industry." Sharp Corp., AU Optronics and the U.S. subsidiary of CMO also acknowledged contact with the DOJ.

69.    The European Commission confirmed on December 12, 2006 that it too has opened an investigation into the price fixing allegations.

70.    And in Japan, the Japanese trade watchdog, Japanese Fair Trade Commission (JFTC), is investigating Sharp, NEC and LG.Philips and at least 7 other manufacturers for allegedly agreeing to cut output to curb declines in panel prices.

## ACTIVE CONCEALMENT

71.    Throughout and beyond the Class Period, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiffs, advancing their

- 22 -

conspiracy in secret. Defendants and their co-conspirators provided public justifications for price increases and supply constraints that were pretextual and false. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the illegal conspiracy effected by the Defendants and their co-conspirators until shortly before this litigation was commenced.

72.    As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, all otherwise-applicable statutes of limitations have been tolled.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

73.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

74.    Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 2002 and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for TFT-LCD in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

75.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

        a.    To fix, raise, maintain and stabilize the price of TFT-LCD;

- 23 -

b.      To allocate markets for TFT-LCD among themselves;

c.      To submit rigged bids for the award and performance of certain TFT-LCD
contracts; and

d.      To allocate among themselves the production of TFT-LCD.

76.     The combination and conspiracy alleged herein has had the following effects,
among others:

a.      Price competition in the sale of TFT-LCD has been restrained, suppressed,
and/or eliminated in the United States;

b.      Prices for TFT-LCD sold by Defendants and their co-conspirators have
been fixed, raised, maintained and stabilized at artificially high, non-
competitive levels throughout the United States; and

c.      Those who purchased TFT-LCD directly or indirectly from Defendants
and their co-conspirators have been deprived of the benefits of free and
open competition.

77.     Plaintiff has been injured and will continue to be injured in its business and
property by paying more for TFT-LCD purchased indirectly from the Defendants and their co-
conspirators than it would have paid and will pay in the absence of the combination and
conspiracy, including paying more for personal computers and other products in which TFT-
LCD is a component as a result of higher prices paid for TFT-LCD by the manufacturers of those
products.

78.     Plaintiff and the class are entitled to an injunction against Defendants, preventing
and restraining the violations alleged herein.

**Second Claim for Relief**

**(Violation of North Carolina Antitrust Law)**

79. Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as if fully set forth herein.

80. During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed TFT-LCD in North Carolina.

81. During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, did the following to effect their conspiracy to fix, maintain or stabilize prices of TFT-LCD sold and/or distributed in North Carolina, in violation of North Carolina Gen. Stat. §§ 75-1 *et seq*.:

> a. Participated in meetings, conversations, and communications in the United States and elsewhere with competitors to discuss the prices of TFT-LCD to be sold in North Carolina and the United States;
>
> b. Agreed, during those meetings, conversations, and communications, to charge prices of TFT-LCD at certain levels to be sold in North Carolina and the United States;
>
> c. Issued price quotations in accordance with the agreements reached; and
>
> d. Exchanged information on sales of TFT-LCD to customers, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

- 25 -

82.     This horizontal price-fixing conspiracy restrained trade or commerce in North

Carolina, and was designed to have, and did have, a substantial and adverse impact on prices for

TFT-LCD in North Carolina during the Class Period.

83.     As a result, Plaintiff and other members of the Class have sustained damages in

an amount to be determined at trial.

## Third Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

84.     Plaintiff incorporates and realleges, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

85.     Defendants have been unjustly enriched through overpayments by Plaintiff and

Class members and the resulting profits.

86.     Under common law principles of unjust enrichment, Defendants should not be

permitted to retain the benefits conferred via overpayments by Plaintiff and Class members.

87.     Plaintiff seeks disgorgement of all profits resulting from such overpayments and

establishment of a constructive trust from which Plaintiff and Class members may seek

restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.     That the Court determine that the Sherman Act and the North Caroline state

antitrust law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2),

and (b)(3) of the Federal Rules of Civil Procedure;

- 26 -

2.    That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

      a.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

      b.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of North Carolina antitrust laws as identified in the Second Claim for Relief herein;

      c.    Acts of unjust enrichment as set forth in the Third Claim for Relief herein.

3.    That Plaintiff and the Class recover damages, as provided by federal and state antitrust law, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

4.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) communicating or causing to be communicated to any other person engaged in the sale of TFT-LCD, information concerning bids of competitors;

5.    That Plaintiff be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

- 27 -

6. That Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

7. That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

8. That Plaintiff and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: March 22, 2007

Respectfully submitted,

/s William F. Patterson, Jr.
wfp@frb-law.com
**Forman Rossabi Black, P.A.**
3623 North Elm Street, Suite 200
Greensboro, NC 27455
336-378-1899

/s Daniel E. Gustafson
Dgustafson@gustafsongluek.com
/s Renae D. Steiner
RSteiner@gustafsongluek.com
/s Jason S. Kilene
Jkilene@gustafsongluek.com
**Gustafson Gluek PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
(612) 333-8844

Attorneys for Plaintiffs

- 28 -